UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAREXEL INTERNATIONAL LLC,<br><br>    Plaintiff,<br><br>v.<br><br>SIGNANT HEALTH HOLDING CORP.,<br>SIGNANT HEALTH LLC, SIGNANT<br>HEALTH GLOBAL LLC, RUBEN<br>CEBALLOS, and KATEHERINE<br>TRAINOR<br><br>    Defendants. | Civil Action No. 1:22-CV-11896-AK |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**A. KELLEY, D.J.**

Plaintiff Parexel International LLC ("Parexel") moves for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. [Dkt. 13]. Parexel seeks to prevent the irreparable harm it alleges that Defendants Signant Health Holding Corp., Signant Health LLC, Signant Health Global LLC, (together "Signant"), Ruben Ceballos, and Katherine Trainor are causing to their business. [Id.]. Because the Court does not have sufficient information at this time to find that Parexel has a likelihood of success on the merits, Parexel's motion for preliminary injunction [Dkt. 13] is **DENIED**.

**I. BACKGROUND**

Parexel is a global clinical research organization ("CRO") which provides clinical development capabilities and integrated consulting expertise. [Dkt. 21 at ¶ 2]. When it comes to clinical research services, Parexel provides services to help its life science and biopharmaceutical

clients in their efforts to create new treatments. [Id. at ¶ 4]. Its services include: (a) early phase services; (b) study design, planning, and execution; (c) decentralized clinical trials; (d) global data operation; (e) medical writing; (f) clinical pharmacology; (g) clinical trial supplies and logistics; (h) genomic medicine services; and (i) clinical adjudication services. [Id.].

Parexel asserts that Signant is also a CRO that competes with it directly by providing a variety of services to biopharmaceutical and life sciences clients with respect to clinical trials. [Dkt. 1 ("Compl.") at ¶ 24]. It states that Signant's SmartSignals program includes six primary services including: (a) patient engagement; (b) IP management; (c) site enablement; (d) clinical outcome assessments; (e) data analytics; and (f) scientific and clinical consulting. [Id. at ¶ 27]. Parexel claims that Signant competes for the same clients in the same market. [Id. at ¶ 28]. It alternatively claims that customers who purchase Signant's products and use them have a reduced need for Parexel's services. [Dkt. 39-1 at ¶ 3].

This claim is disputed though by Signant. Signant asserts that it is not a CRO, like Parexel, as it does not provide holistic clinical trial management but that it instead focuses on a narrow segment of clinical trials wherein digital product management is required. [Dkt. 34 at ¶¶ 15-16]. While it acknowledges that both companies work on clinical trials globally, Signant instead characterizes itself as an evidence generation company whose focus is on providing digital products that streamline clinical trials. [Id. at ¶ 4]. They claim any services they provide are a smaller part of their business and are limited to data quality monitoring, protocol advisory, and rater training and qualification. [Id. at ¶ 13]. Parexel needs to engage a vendor, like Signant,

to collect patient derived data on devices, and on multiple occasions, the two have worked together on behalf of the same customer for the same clinical trial. [Id. at ¶ 18].

Ruben Ceballos was hired by Parexel in a project leadership position and was eventually promoted to Senior Director of Project Leadership. [Compl. at ¶¶ 29-31]. In that role, he had access to confidential information including but not limited to customer lists and related information, vendor lists including pricing information, a customer relationship database, and Parexel-specific pricing models. [Id. at ¶ 35]. Parexel asserts that such information is highly sensitive and commercially valuable to its competitors. [Id. at ¶ 36].

In order to protect its confidential information and trade secrets, Parexel required Ceballos to agree to confidentiality and non-disclosure provisions restricting the disclosure of such information. [Id. at ¶ 41]. This was in addition to a range of other measures to ensure the security of its information, such as implementing a web application firewall, encrypting its data, and monitoring threats to its computer systems and networks. [Id. at ¶¶ 39-40].

On or around November 1, 2018, Ceballos signed a key employee agreement ("KEA"). [Id. at ¶ 55]. That KEA included additional obligations to safeguard confidential information. [Id. at ¶¶ 55-60]. It also included a provision that prohibited him from working for a "Competing Company" for a period of six months following the end of his employment at Parexel. [Id. at ¶ 61]. It defined competing company as:

> any person, entity, or company, including any division, department or affiliate thereof, which offers products or services in competition with the Company (including any new products or services being developed or researched by the Company prior to and as of the date of Employee's termination) in connection with the research, development and/or commercialization of pharmaceutical products, biotechnology products and/or medical devices, including, without limitation: clinical research; clinical trial management; clinical pharmacology; laboratory research; data

3

> collection, management, processing, analysis and/or reporting; biostatistics; clinical logistics; consulting and regulatory affairs; commercialization; medical affairs; reimbursement and market access; staffing and personnel placement; medical communication; medical imaging; and software, electronic and technology solutions relating to the above (collectively defined as "Products or Services"). A "Competing Business" shall include any person, entity or company that, although not currently offering Products or Services, plans to develop Products or Services and/or seeks to engage Employee for the purpose of developing such Products or Services[.]

[Id.]. In July 2022, Ceballos claims that he saw a publicly posted position with Signant for the role of Vice President of Global Project Management and applied. [Dkt. 35 at ¶ 8]. He denies being approached by Katherine Trainor about submitting an application. [Id. at ¶ 9].

Katherine Trainor, a colleague of Ceballos' at Parexel, entered into a similar KEA. Her KEA included the below provision.

> Employee agrees that while he/she is employed by the Company and during the twelve (12) months immediately following the termination of his/her employment for any reason, whether voluntarily or involuntarily, Employee shall not, directly or indirectly, solicit, hire, offer employment to, or in any manner encourage employees of the Company to leave employment with PAREXEL or otherwise violate their obligations to the Company.

[Compl. at ¶ 48].

An analysis of Trainor's laptop found a Microsoft Teams message sent by Trainor to another coworker on January 12, 2022 which stated "I told rubes today – he wants to a) go to you or b) go with me." [Dkt. 16 at ¶ 15]. On or around February 2, 2022, Trainor left the company and joined Signant. [Compl. at ¶ 66]. She was granted a limited-waiver of the non-competition provision in her KEA. [Id.]. On July 18, 2022, a Teams meeting was held that was titled "Ruben/Kate – Opportunity Discussion." [Id. at ¶ 68]. Trainor explains that she was sent the Teams meeting invitation by Signant's recruiter, but that she told the recruiter that, per her

agreement with Parexel, she could not participate in the interview process. [Dkt. 34 at ¶ 22]. In a reply to Signant's recruiter, Trainor said "I cannot be part of interview. I may have already had a convo with him on the side, but cannot be part of interview. I would recommend him 100000% know him well. Should consider him at Sr. Dir, maybe even VP level." [Dkt. 34-1 at 2]. Trainor denies attending any meetings concerning Ruben, participating in any part of his hiring, or encouraging him to leave Parexel and join Signant in any way. [Dkt. 34 at ¶¶ 23-24]. Her explanation for the conversation she had with Ruben "on the side" is that the two spoke long before he applied to catch up as friends. [Id. at ¶ 24].

On August 5, 2022, Ceballos informed Shannon Macquarrie, Parexel's Senior Vice President for Global Project Leadership, that Signant had extended an offer but that he was not planning to accept it. [Dkt. 21 at ¶ 14]. In subsequent discussions, Macquarrie reminded Ceballos that he was still subject to the terms of his KEA unless he was granted a written release. [Id. at ¶¶ 15, 17]. On August 15, 2022, Ceballos submitted his resignation to Macquarrie. [Id. at ¶ 16]. He had not obtained a release from Parexel at that point and Macquarrie told him that because Signant is a competitor of Parexel, Parexel would enforce his six-month restriction prohibiting him from beginning his employment until March 9, 2023. [Id. at ¶ 17]. Macquarrie learned from a LinkedIn post on September 21, 2022 that Ceballos had started his new position at Signant. [Id. at ¶ 18].

An audit log for Ceballos' Parexel owned laptop revealed that prior to his departure, between August 24, 2022 and September 8, 2022, he previewed, accessed, and/or downloaded a number of files that he did not need to view for any job-related purpose. [Id. at ¶¶ 12-13]. The documents downloaded were housed in a single parent folder titled "Documents." [Dkt. 21-1]. These files contained client pricing and intelligence information, information about other Parexel

employees, and training and project management information. [Dkt. 21 at ¶ 12]. They included documents related to Pfizer, which is a client of Parexel but not one whose account Ceballos was assigned to. [Id. at ¶ 13]. The same day he viewed Pfizer files, a preliminary forensic analysis showed that Ceballos attached two USB drives to his laptop. [Id.]. Ceballos' explanation for this is that he wanted to take his personal files with him, such as photos, passwords, and personal notes which were saved on his "Documents" folder. [Dkt. 35 at ¶ 5]. He says on August 25, 2022, that he downloaded those files on to his personal Microsoft OneDrive account and that he "absentmindedly" copied over his entire Documents folder instead of spending time to sift through the files. [Id.]. He denies revisiting the folder's contents since leaving the Parexel, denies being asked to download anything, and denies providing any confidential information, from that download or otherwise, to Signant. [Id. at ¶¶ 5-7].

Parexel filed their Complaint on November 11, 2022 asserting claims against Ceballos, Trainor, and Signant for breach of contract, violations of the DTSA and MUTSA, breach of fiduciary duty, tortious interference, and unfair and deceptive trade practices. [Compl. at ¶¶ 102-88]. Prior to the filing of Plaintiff's motion for preliminary injunction, the parties met to see if they could reach a resolution of their issues. [Dkt. 36 at ¶ 3]. Parexel sought to prevent Ceballos from running clinical trials for Signant clients and from supervising, managing, mentoring, recruiting, or training other employees who are running clinical trials for Signant clients. [Id. at ¶ 5]. Signant retorted that this would prohibit Ceballos entirely from performing the job that he was hired to do. [Id.].

On December 21, 2022, Plaintiff filed their motion for preliminary injunction alongside a motion for leave to take immediate and limited expedited discovery. [Dkt. 13; Dkt. 22]. The Court granted the latter motion in part and denied it in part and required the forensic analysis of

Ceballos' OneDrive to proceed in an expedited fashion. [Dkt. 53]. The Court adopted the parties joint proposed schedule thereafter. [Dkt. 56].

## II. LEGAL STANDARD

"A preliminary injunction is 'an extraordinary and drastic remedy' that is never awarded as of right." Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)) (citations omitted). A Plaintiff seeking a preliminary injunction must establish that they are: (1) likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; (4) and that an injunction is in the public interest. Id. (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)). If a plaintiff is unable to meet one out of the four elements, the motion for injunctive relief will be denied. EchoMail, Inc. v. Am. Exp. Co., 378 F. Supp. 2d 1, 2 (D. Mass. 2005). The most important of the four elements is the likelihood of success on the merits which is considered the "sine qua non" of the inquiry. Ryan v. ICE, 974 F.3d 9, 18 (1st Cir. 2020) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).

The evaluating court need not conclusively determine the merits of the movant's claim but should evaluate the likelihood or not that the movant will prevail on the merits. Id. When there is a close factual dispute which could go either way at trial, a court should be reluctant to grant injunctive relief. A-Copy, Inc. v. Michaelson, 599 F.2d 450, 451 (1st Cir. 1978). The Court may accept as true well-pleaded allegations in the complaint and uncontroverted affidavits. Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976)). The Court may also rely upon otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary

injunction. Howe v. U.S. Bank Natl. Assn. as Tr. for RMAC Tr. Series 2016-CTT, 440 F. Supp. 3d 99, 102 (D. Mass. 2020) (citing Asseo v. Pan American Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986)).

## III. DISCUSSION

Plaintiff asserts that they have a likelihood of success on their claims that (1) Ceballos and Trainor breached their contracts; (2) that Signant tortiously interfered with Ceballos' KEA and Trainor's KEA; (3) and that Defendants violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), Mass. Gen. Laws ch. 93, § 42 et seq.  [Dkt. 14 at 12-18].

### A. Breach of contract claims

#### 1. Trainor's Non-solicit Provision

Trainor's contract requires that, for the 12 months that follow her termination, she may not "directly or indirectly, solicit, hire, offer employment to, or in any manner encourage employees of the Company to leave employment with Parexel or otherwise violate their obligations to the Company."  [Dkt. 15-2 at 3].  Parexel argues that Trainor violated her agreement by inducing Ceballos to leave Parexel and join Signant.  [Dkt. 14 at 6-7, 11].  As evidence for this, they highlight a July 18, 2022 Microsoft Teams opportunity discussion which both Ceballos and Trainor were invited to, an earlier message in January of 2022 on Teams in which Trainor told a colleague "I told rubes today – he wants to a) go to you or b) go with me.  [Dkt. 16 at ¶ 13, 15.].  They further argue that Trainor's own declaration indicates that she took actions, directly or indirectly, to solicit Ceballos.  [Dkt. 39 at 2].  They highlight an email in which Trainor said that while she could not be part of Ceballos' interview, she "may have already had a convo with him on the side" and she recommended that they hire Ceballos "100000%" including for a senior level position.  [Dkt. 34-1 at 2].

8

Trainor retorts in her declaration that she did not play any role in recruiting Ceballos, that she did not attend the Teams meeting in question in order to comply with her KEA, that she informed Signant's recruiter that she could not be involved in his hiring process, that any conversation she had with Ceballos "on the side" was only a conversation between friends, and that she never asked Ruben to apply or suggested he leave Parexel. [Dkt. 34 at ¶¶ 21-24].

Plaintiff has not met its burden establishing a likelihood of success on the merits for their breach of contract claim against Trainor. The sum total of facts available to the Court does not, as of yet, demonstrate that Trainor violated the non-solicitation provision of her employment agreement.

Trainor's declaration instead indicates that she was aware of her obligations under her KEA and was attempting to abide by them. [See id.]. Ceballos also attests in his declaration that he applied to the job after seeing it publicly posted. [Dkt. 35 at ¶ 8]. He claims Trainor did not approach him about the position or in any way convince him to apply. [Id. at ¶ 9]. There may be some circumstantial evidence contradicting their stories, such as Trainor's comments about having had a conversation with Ruben or her Teams message about "Rubes" but this, without more facts providing context, is insufficient to deem it likely that Trainor violated her obligations under her KEA. The fact that an employee planning to work for a competitor has a conversation with another employee about whether they were considering a job with that same competitor, and that employee also later joins the competitor, is not sufficient to demonstrate a violation of a non-solicitation clause in an employment contract. Reasonable limits—Non-solicitation of employees, 3 Callmann on Unfair Comp., Tr. & Mono. § 16:44 (4th ed.) (citing Cintas Corp. v. Perry, 517 F.3d 459, 468 (7th Cir. 2008)).

Additionally, the available facts do not show that Trainor indirectly violated her obligation not to solicit, hire, offer employment to, or encourage Ceballos to leave employment with Parexel or otherwise violate his obligations to the Company. Trainor did recommend Ceballos as a candidate in a message sent to the recruiter at Signant, but this message was directed only internally within Signant and not towards Ceballos. [Dkt. 34-1 at 2]. The facts do not yet demonstrate that she encouraged him, directly or indirectly, to leave Parexel or to come to Signant. Ceballos may not have been aware of her recommendation at all. This does not establish Ceballos was induced to leave his position at Parexel as a result of the recommendation.

This, combined with the fact that she likely played no role in the hiring process, suggests that she played no role in offering Ceballos employment or encouraging him to leave Parexel. Thus, the available facts indicate that she had the separation necessary to abide by her non-solicitation agreement.

### 2. Ruben Ceballos' Non-compete Provision

Part of Ceballos' KEA prohibited him from working for any "Competing Company" for a six-month period following the end of his employment at Parexel. [Compl. at ¶ 61]. Parexel asserts that Ceballos violated his KEA's non-competition provision by joining Signant within days of him leaving Parexel. [Dkt. 14 at 11-12]. Ceballos argues that the restrictive covenant in the agreement is an overbroad extension that is therefore unenforceable. [Dkt. 33 at 8-9].

There is a close factual dispute as to whether Signant and Parexel can fairly be described as competitors. This therefore precludes injunctive relief on this question. Michaelson, 599 F.2d at 451. The KEA defined a "Competing Company" broadly as "any person, entity, or company . . . which offers products or services in competition with the Company . . . in connection with the research, development and/or commercialization of pharmaceutical products, biotechnology

products and/or medical devices." [Compl. at ¶ 61]. This includes companies working on "software, electronic and technology solutions" related to Parexel's clinical research work. [Id.]. It is unclear whether Signant falls into that definition given that its primary work touches on a different aspect of clinical trials.

With how broadly the term is defined in the KEA though, it is likely Signant would fall into the KEA's definition of a competing company. [See Dkt. 34 at ¶¶ 14-15]. However, given how much the focuses of the two companies appear to diverge, extending the restrictive covenant to Ceballos' work at Signant may render the restrictive covenant broader than necessary. The likelihood of Parexel's success on the merits turns on whether the restrictive covenant is enforceable as to his work with Signant. Parexel is not able to establish at this time that it is.

Although "a business may protect its legitimate business interests, a covenant not to compete must be no more restrictive than necessary." Boulanger v. Dunkin' Donuts Inc., 815 N.E.2d 572, 579 (Mass. 2004); see also Sodexo Operations, LLC. v. Abbe, 382 F. Supp. 3d 162, 165 (D. Mass. 2019) ("Massachusetts only enforces non-compete agreements that are tailored to protect a legitimate business interest"). Under Mass. Gen. Laws. ch. 149, Section 24L(b)(iii), such an agreement must be "no broader than necessary to protect one or more of the following legitimate business interests of the employer: (A) the employer's trade secrets; (B) the employer's confidential information that otherwise would not qualify as a trade secret; or (C) the employer's goodwill." An unreasonable noncompete covenant would not be invalidated completely but will be enforced to the extent that it is reasonable. Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 968 F.2d 1463, 1469 (1st Cir. 1992) (quoting L.G. Balfour Co. v. McGinnis, 759 F. Supp. 840, 845 (D.D.C. 1991)).

Defendants argue that the restriction on Ceballos' ability to work at Signant is necessary to protect its legitimate business interests including for preserving the "good will" it has built with its customers. [Dkt. 14 at 12-13]. See Kroeger v. Stop & Shop Companies, Inc., 432 N.E.2d 566, 570 (Mass. App. 1982); IKON Off. Sols., Inc. v. Belanger, 59 F. Supp. 2d 125, 128-29 (D. Mass. 1999) (Describing the positive reputation a business may have amongst its customers and potential customers as a form of good will).

Since Parexel is a CRO and Signant is not, they do not compete with each other for the same contracts on clinical trials and therefore cannot fairly be said to be competing for the same customers. The two companies appear to focus on different aspects of the same industry. Parexel does not provide any of Signant's four primary digital products and needs to use a vendor to collect the type of data that Signant provides. [Dkt. 34 at ¶¶ 15]. Notably, the two have worked together on behalf of the same customers on multiple occasions. [Id. at ¶ 18]. This undermines Parexel's claim that Signant can be characterized as a competitor because customers are not required to choose between purchasing Signant's products or Parexel's services. [Dkt. 39-1 at ¶ 3]. Based on these available facts, an employee going from Parexel to Signant would therefore have no measurable impact on the goodwill Parexel enjoys amongst its clients.[1]

Signant may provide some services in addition to its products, but it is unclear whether those services are in competition with Parexel's work and whether Ceballos' work for Signant involves rendering those services. Signant's attorney characterized a proposal to allow Ceballos

---

[1] The restrictive covenant as to non-recruitment is justified by the legitimate business reason of maintaining goodwill among employees. Seniorlink Inc. v. Landry, 19-CV-11248-DJC, 2021 WL 3932309, at *8 (D. Mass. Sept. 2, 2021) ("Employers . . . clearly have a legitimate business interest in preserving the talent and goodwill of their employees, which includes keeping current employees and ensuring they are not influenced to leave by former employees" (quoting Advanced Micro Devices, Inc. v. Feldstein, No. 13-cv-40007-TSH, 2013 WL 10944934, at *11 (D. Mass. May 15, 2013)) (internal quotations omitted). As discussed above, the facts are not fully clear at this time regarding Trainor's recruitment of Ceballos. Given that the parties did not address the impact on the goodwill Parexel enjoys amongst its own employees in regards to Ceballos' alleged violation of his KEA, the Court declines to address that justification for Ceballos' restrictive covenant any further.

to work at Signant without managing clinical trials for Signant's clients as preventing him "entirely from performing his job." [Dkt. 36 at ¶ 5]. While this information may be relevant, the Court is not persuaded that it establishes that Ceballos' work at Signant is the same as his work at Parexel, and therefore it does not prove that the two parties are in competition with one another. Those statements appear to be more of a reflection of the parties' negotiating positions rather than substantive evidence. Additionally, Ceballos' work on managing clinical trials could refer to managing the use of Signant products when they are employed in clinical trials rather, than managing clinical trials themselves.

The difference in industry focus also reduces the likelihood that Ceballos' new position, despite the similarities Parexel argues it has to his old one, would put at risk trade secrets and confidential information that otherwise would not qualify as a trade secret. Ceballos is entitled to draw on his project management skills he learned at Parexel in his new role. Dynamics Research Corp. v. Analytic Scis. Corp., 400 N.E.2d 1274, 1282 (Mass. App. Ct. 1980) ("an employee upon terminating his employment may carry away and use the general skill or knowledge acquired during the course of the employment." (quoting Junker v. Plummer, 320 Mass. 76, 79 (1946)). The need for Parexel to protect itself from Ceballos sharing such information is unclear. It is notable that Trainor, a more senior executive, who joined Signant from Parexel did not have noncompete provisions enforced against them. [Dkt. 34 at ¶ 21].[2] Even if Ceballos did have access to confidential information about Parexel he learned over the course of his work there, [Dkt. 21 at ¶ 10], it is uncertain whether such information would benefit Signant in any way or harm Parexel, given the apparent lack of competition between the two.

---

[2] In addition to waiving the noncompete against Trainor, Defendants assert that Parexel waived the noncompete for Jason Martin as well whom Signant hired to be their Chief Operating Officer. [Dkt. 33 at 5]. Parexel does not contest this allegation. However, the authority Signant cites is the declaration of Dunia Ammar [Dkt. 37] which contains no such reference to Martin.

13

Since Ceballos' noncompete provision may be more expansive than is necessary, it cannot be said to be tailored to protect a legitimate business interest. See Abbe, 382 F. Supp. 3d at 165. Parexel has therefore not established a likelihood of success on their breach of contract claims against either Ceballos or Trainor.[3]

### B. Tortious Interference

Parexel also asserts that Defendants Signant and Trainor tortiously interfered with Ceballos and Trainor's KEA's by allowing Trainor to recruit Ceballos to a competitor, in violation of both of their KEA's. [Compl. at ¶¶ 166-80; Dkt. 14 at 18]. To establish a tortious interference claim, "the plaintiff must prove that (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Harrison v. NetCentric Corp., 744 N.E.2d 622, 632 (Mass. 2001).

Here Parexel fails to establish a likelihood of success on the merits for many of the same reasons that it failed to show a likelihood of success on its breach of contract claims. As to Signant interfering with Trainor's non-solicit provision, the information available outlines a factual dispute and it is thus inappropriate to grant injunctive relief. Similarly, if it is unclear whether Ceballos violated his non-compete agreement, then Signant cannot be said to have knowingly induced Ceballos to breach his contractual obligations to Parexel.

---

[3] The parties submitted briefing on the issue of whether equitable tolling should allow the restrictive period to be tolled so that the restrictive period could begin again on the date that injunctive relief is granted. [Dkt. 50; Dkt. 51]. Ceballos and Trainor's contract included a tolling provision that would extend the restrictive period if a breach occurs "until such a breach is duly cured." [Dkt. 15-1 at 9; Dkt. 15-2 at 9]. Defendant also argues that because the applicable time period for Ceballos' restrictive covenant has expired, any equitable relief is barred and Parexel's relief is limited to money damages. [Dkt. 50 at 2-3]. When the restrictive period has expired, even if the delay was because of time lost litigating the case, specific relief is inappropriate. EMC Corp. v. Arturi, 655 F.3d 75, 77 (1st Cir. 2011). The text of the agreement did not contain language tolling the term of restriction during litigation or after preliminary finding of breach which would enable the time on the restrictive covenant to be extended. See id. Since the Court has not made a determination that a breach of contract occurred though, preliminarily or otherwise, it need not reach the issue of tolling.

14

**C. DTSA and MUTSA**

Whether Ceballos and Signant misappropriated Parexel's trade secrets is a separate question though. The DTSA and MUTSA are nearly equivalent. Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 386 F. Supp. 3d 89, 94 (D. Mass. 2019). The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret". 18 U.S.C. § 1839(5).

To establish a claim for misappropriation of a trade secret under either statute, the plaintiff must show (1) the existence of a trade secret; (2) that the plaintiff took reasonable steps to secure the confidentiality of that trade secret; and (3) the defendant "used improper means, in breach of a confidential relationship, to acquire and use the trade secret." T.H. Glennon Co., Inc. v. Monday, No. CV 18-30120-WGY, 2020 WL 1270970, at *13 (D. Mass. Mar. 17, 2020). The DTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5).

### 1) Existence of Trade Secrets

A trade secret is a specified piece of information that at the time of the misappropriation provided an actual or potential economic advantage to its holder from not being known or readily ascertainable. 18 U.S.C. § 1839(3); Mass. Gen. Laws ch. 93, § 42(4). It may include "a formula, pattern, compilation, program, device, method, technique, process, business strategy, customer list, invention, or scientific, technical, financial or customer data." Mass. Gen. Laws ch. 93 §

42(4).  The subject matter of a trade secret must be secret and cannot include matters of public knowledge or general knowledge within an industry.  J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 260 N.E.2d 723 (Mass. 1970) (quoting Restatement (First) Torts § 757 comment (b)).

Defendant argues that Parexel identifies no specific trade secrets in the files that would give Ceballos or Signant any type of competitive advantage.  [Dkt. 33 at 11].  The Court disagrees. Parexel lays out the following types of documents it asserts that Ceballos misappropriated: (1) customer lists and related information; (2) operational structures of clinical trials conducted by Parexel for its customers; (3) account strategies regarding Parexel's customers; and (4) internal assessments regarding ongoing projects.  [Dkt. 14 at 16].  These documents included information on client pricing and intelligence, including but not limited to Parexel's client Pfizer, information about other Parexel employees, and training and project management information.  [Dkt. 21 at ¶ 12-13].  Parexel additionally asserts that this information represented highly-guarded commercially valuable trade secrets which they invested substantial resources into developing and which would be useful to Signant.  [Id. at ¶ 11].

The files accessed bear the names of Parexel clients and allegedly included pricing information and other intelligence about them.  [Id. at ¶ 12].  This financial and customer data falls neatly into the definition of a trade secret under Massachusetts law.  See Mass. Gen. Laws ch. 93, § 42(4).  Such information is likely valuable to Parexel for maintaining those relationships.  Therefore, the information can be fairly characterized as giving its holder an advantage over all its competitors in its industry that work with, or seek to work with, those clients.  See Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 239 (D. Mass. 2011) (finding that customer list featuring contact information, fees, and records was a trade secret

16

because the information therein of each customer's needs gave the company a competitive advantage).

The fact that it is unclear at this juncture whether Signant is a direct competitor with Parexel does not alter that conclusion. The information could be of value to Signant, even if used for purposes other than poaching clients. As such, the Court finds that Parexel has established a likelihood that such files contained trade secrets.

### 2) Reasonable Efforts to Maintain Secrecy

In evaluating whether a company took reasonable efforts to protect the trade secrets at issue, the Court may consider some of the following factors: (1) the presence or lack thereof of a confidentiality agreement; (2) the nature and extent of security precautions; (3) the circumstances in which the information was disclosed; and (4) the degree to which the information is already in the public domain or readily ascertainable. See Id. at 239-40 (quoting TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F.Supp.2d 23, 29 (D. Mass. 2004)).

Parexel employs a range of measures to protect its confidential information including requiring employees, like Ceballos, who had access to confidential information to sign confidentiality agreements and non-disclosure provisions. [Dkt. 18 at ¶ 3-4; Dkt. 1-3]. This makes it likely that the efforts they took to protect their trade secrets were reasonable.

### 3) Improper Means

Lastly, Parexel must demonstrate that the trade secrets at issue were obtained through improper means in breach of a confidential relationship. TouchPoint Solutions, Inc., 345 F.Supp.2d at 31. Improper means includes "theft, bribery, misrepresentation, unreasonable intrusion into private . . . electronic space, or breach or inducement of a breach of a confidential relationship." Mass. Gen. Laws ch. 93, § 42 (1). A third party who knowingly benefits from a

trade secret obtained in violation of a confidential relationship is also liable for the misappropriation of that trade secret. Data Gen. Corp. v. Grumman Sys. Support Corp., 795 F. Supp. 501, 507 (D. Mass. 1992). The holder of a trade secret may be harmed "merely by the disclosure of his secret to others as well as by the use of his secret in competition with him." Restatement (First) of Torts § 757 comment (c) (1939). If an actor acquires a trade secret by mistake, he is obliged to not disclose or use the secret. Id. at (d).

While the facts here raise questions about Ceballos' conduct, they do not show that Defendants acquired the trade secrets by improper means as it is unclear yet if Defendants have acquired those trade secrets at all. The available forensic analysis shows that, shortly before leaving Parexel, Ceballos previewed, accessed, and/or downloaded files related to Parexel's clients that he did not have a work purpose to view, including some that contained information about Parexel's clients. [Dkt. 21 at ¶¶ 12-13]. He did so, in at least one instance, on the same day that he inserted two USB drives into his laptop. [Id. at ¶ 13]. What is on those USB drives and Ceballos' OneDrive is unclear as is whether Signant has come into possession of any information contained therein. Signant for its part asserts that it has not seen any of this information and that it did not even learn of the download until this litigation began. [Dkt. 33 at 5]. Ceballos asserts that he was not asked by anyone at Signant to download that information and that he has not provided that information to Signant. [Dkt. 35 at ¶¶ 6-7, 14]. Ceballos' explanation, that he dropped his entire Documents folder into his personal OneDrive account out of laziness, either reflects innocuous carelessness or duplicity. His explanation of carelessness though is supported by the fact that all the downloaded files were located in a single parent folder titled "Documents." [Id. at ¶ 5; Dkt. 21-1].

Where, as here, the Court does not have sufficient information to conclude that Defendants have obtained or used the trade secrets at issue, the Plaintiff has not met their burden to establish the improper means element. See In re Document Techs. Litig., 275 F. Supp. 3d 454, 463 (S.D.N.Y. 2017) (finding that the plaintiff had failed to show likelihood of success on merits because digital forensic analysis failed to show information at issue was ever inserted into the defendants computers and the defendants provided credible innocuous explanations for their conduct); Midwest Sign & Screen Printing Supply Co. v. Dalpe, 386 F. Supp. 3d 1037, 1052-53 (D. Minn. 2019) (Finding no misappropriation because no evidence showed that the defendant received emails from former employee containing trade secrets); Smart Mortg. Centers, Inc. v. Noe, No. 21-CV-3606, 2022 WL 832663, at *7 (N.D. Ill. Mar. 21, 2022) (Dismissing DTSA claim because there were no allegations that the confidential information was uploaded to defendant's servers or that defendants ever used or disclosed the information).

This Court has already ordered that the OneDrive be produced for forensic analysis on an expedited basis. [Dkt. 53]. The outcome of that, and any additional information that would demonstrate that Signant ever gained access to the trade secrets, could alter this conclusion. Absent that however, the Court cannot conclude that Defendants employed improper means to acquire Parexel's trade secrets.

### IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Parexel's Motion for Preliminary Injunction. [Dkt. 13].

**SO ORDERED.**

Dated: April 13, 2023                                                     /s/ Angel Kelley
                                                                                        Hon. Angel Kelley
                                                                                        United States District Judge